**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| PROXENSE, LLC, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : C.A. No. 6:20-cv-00879-ADA |
| | : |
| TARGET CORPORATION, | : |
| | : |
| Defendant. | : |
| | : |

**<u>DEFENDANT'S RESPONSIVE CLAIM CONSTRUCTION BRIEF</u>**

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ............................................................................................................1

II. PROXENSE MANIFESTLY MISCHARACTERIZES THE ACTUAL
    DISCLOSURE IN THE '533 PATENT SPECIFICATION...............................................3

    A.  Proxense Manifestly Mischaracterizes the Specification's Disclosure
        Relevant to the "Time Slot Information" Limitations ............................................. 3

    B.  Proxense Manifestly Mischaracterizes the Specification's Disclosure
        Relevant to the "Server" Limitations ...................................................................... 5

III. ARGUMENT ...............................................................................................................11

    A.  The "Time Slot Information" Limitations Require Construction and Such
        Construction Cannot be Divorced from the Claim Language and Relevant
        Disclosure in the Specification ............................................................................. 11

    B.  Proxense's Prosecution-Induced Ambiguities in the "Server" Limitations
        Render the Claims Indefinite ................................................................................ 15

        1.  Canons of the Definiteness Requirement under § 112, ¶2........................ 15

        2.  The "Server" Limitations Would Have Multiple Meanings to a POSITA
            Reading the Claims in View of the Specification..................................... 16

        3.  A POSITA Would Have No Informed or Confident Choice Among the
            Contending Meanings ............................................................................. 19

# TABLE OF AUTHORITIES

**Cases**

*Adaptix, Inc. v. Apple, Inc.*, No. 5:13-cv-01776-PSG, 2015 U.S. Dist. LEXIS 8806 (N.D. Cal. Jan. 23, 2015) ................................................................................................16, 20

*Advanced Aero. Techs., Inc. v. U.S.*, 124 Fed. Cl. 282 (2015) ...............................16, 20

*Every Penny Counts, Inc. v. Wells Fargo Bank, N. A.*, 4 F. Supp. 3d 1286 (M.D. Fla. 2014) ................................................................................................................16, 20

*Interval Licensing LLC v. AOL Inc.*, 766 F.3d 1364 (Fed. Cir. 2014)....................16, 20

*Microsoft Corp. v. Proxyconn, Inc.,* 789 F.3d 1292 (Fed. Cir. 2015), *overruled on other grounds* by *Aqua Prods., Inc. v. Matal*, 872 F.3d 1290 (Fed. Cir. 2017) (en banc)...............14

*Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898 (2014) ....................... 15-16, 20

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351 (Fed. Cir. 2008) ................15

*Parthenon Unified Memory Architecture LLC v. Apple Inc.*, No. 2:15-cv-00621-JRG-RSP, 2016 U.S. Dist. LEXIS 78935 (E.D. Tex. June 16, 2016)........................16, 20

*Phillips v. AWH Corp.,* 415 F.3d 1303 (Fed. Cir. 2005) ..............................................14

**Statutes**

35 U.S.C. § 112, ¶2 ......................................................................................................15

# I. INTRODUCTION

The invention Proxense described in its original January 2006 disclosure and its January 2007 specification for the patent-in-suit does not match the Asserted Claims that Proxense applied for in March 2019. Proxense's claim construction arguments highlight this disparity. In its Opening *Markman* Brief ("Op. Br.", Dkt. 26), Proxense tries to explain away the disconnect between the written description and the Asserted Claims by mischaracterizing the specification excerpts on which it relies[1] and then arguing for non-constructions based on these mischaracterizations (Op. Br. at 4-5, 11-12[2]) and its assertion that "the claims use plain English words (*e.g.*, 'time slot information,' 'server') readily understandable to a person of ordinary skill in the art ("POSITA") and that a jury will be able to understand" (Op. Br. at 1, 9-14). Proxense's assertion, however, fails to account for the specification, which is the lens through which a POSITA would view these terms.

Substantively, the claim construction disputes can be grouped into two buckets: (1) the "time slot information" limitations and (2) the "server" limitations. With respect to the first bucket—"time slot information" limitations—Proxense advances a non-construction argument based on the absence of lexicography or a clear and unmistakable disavowal, in the specification. Op. Br. at 8-12. But here, time slot information is not a term of art that is used consistently within the specification and, therefore, a POSITA would turn to the specification for guidance as to what the phrase means, consistent with long-standing Federal Circuit precedent requiring that claims must *always* be read in light of the specification and its teachings at the time of the

---

[1] Op. Br. at 4-5 *citing* '533 Patent (Dkt. 26-3) at Fig. 26 (and corresponding disclosure at 26:61-27:15), 6:30-47, 9:24-31; *see also id.* at 11-12 *citing* '533 Patent at 6:40-47, 9:14-10:14, 10:21-38, 15:15-21; *see* §§ II.A, II.B below.

[2] Target's citations herein are to the internal page numbers of the Op. Br. (Dkt. 26).

invention.  This principle is especially important here where Proxense seems to advance an interpretation of the phrase that is inconsistent with the claims themselves.  According to the claims (and the specification), time slot information is a known period of time between two successive beacons that enables the sleep/wake cycle to "maximize [the "[second][3] wireless transceiver" (PDK's)] battery life" (Op. Br. at 4) and "guarantee reception of a beacon [by the "[second] wireless transceiver" (PDK)] if one is present" ('533 Patent at Fig. 26, 26:61-27:15).  Neither the specification, nor Target's construction, have anything to do with whether communications are "bi-directional communication between the first and second wireless devices," as argued by Proxense.  Op. Br. at 9-12.  Rather, Target's constructions flow directly from the actual disclosure by the inventor and capture the claim requirements that (1) the claimed "time slot information" is the basis for the claimed "timer" switching the "[second] wireless transceiver" (PDK) from "sleep mode" to "active mode"[4], and (2) the purpose of the "active mode" of the "[second] wireless transceiver" (PDK) is to "monitor[] a first channel for a beacon during the active mode."[5]  In other words, the claimed "time slot information" is not any "information" about any "time slot" for any purpose.  Yet, that is what Proxense appears to try to capture through its arguments and inherently confused construction, *i.e*., "a period of time that information is communicated between two devices information" or "information about a period of time that information is communicated between two devices."  Given the parties' dispute, this phrase should be construed now to avoid jury confusion later on.

　　　　With respect to the second bucket—the "server" limitations—Proxense waffles between:

---

[3] In contrast to claim 1 (which recites "first" and "second" "wireless transceiver[s]", claim 11 only recites one "wireless transceiver." '533 Patent at 41:42-50 (claim 1), 42:28-45 (claim 11).

[4] '533 Patent at claim 1 (41:48-58), claim 11 (42:28-32), Figure 26, 26:61-66, 27:8-15.

[5] '533 Patent at claim 1 (41:59-60), claim 11 (42:33-35), Figure 26, 26:66-27:15.

1) its argument that "the claims do no reasonably present multiple possible meanings" and

2) its admissions that, for example, "[t]he claim language is silent on the specific path by which the server receives data" and the "'server' limitations do not require the second wireless device to communicate through the first wireless device … [this] may be permissible, but it is not necessary."

Op. Br. at 10-11, 13-16.  This admitted ambiguity is a direct consequence of Proxense's prosecution strategy and claim drafting aimed at capturing 2019 technology that is inconsistent with the invention Proxense described more than a decade earlier.  The ambiguity starts with inherently ambiguous claim limitations and is compounded by the disconnect between Proxense's infringement arguments (*i.e.*, that the "second wireless device" (claims 1, 7, 17) or the "wireless transceiver" (claim 11) communicates ***directly*** with the "server" without an intermediary "first wireless device") and the actual disclosure in the specification which, in all embodiments, only describes a "second wireless device" (PDK) as communicating with a "server" via an intermediary "first wireless device" (RDC).  The result is a claim limitation that Proxense effectively admits can have multiple meanings and for which a POSITA would ***not*** have an informed or confident choice as to which of the possible meanings is the proper meaning, in the context of the Asserted Claims and the specification.  Under controlling precedent, Proxense's prosecution-induced ambiguity renders its claims indefinite.

## II. PROXENSE MANIFESTLY MISCHARACTERIZES THE ACTUAL DISCLOSURE IN THE '533 PATENT SPECIFICATION

At several instances in its Opening Brief, Proxense makes assertions that manifestly mischaracterize the actual disclosure in the '533 Patent specification.

### A. Proxense Manifestly Mischaracterizes the Specification's Disclosure Relevant to the "Time Slot Information" Limitations

In the Introduction section of its Opening Brief (Op. Br. at 4), Proxense asserts that the

disclosed sleep/wake cycle in Figure 26 describes an "active mode" in which (1) if the PDK does
***not*** detect a beacon in a first scan, it does another scan for beacons on another channel before it
returns to "sleep mode", and (2) if the PDK ***does*** detect "a compatible beacon signal" in one of
these scans, it returns to "sleep mode."  As shown in the table below, with Proxense's assertions
on the left and the actual text from the corresponding section of the specification for Figure 26
on the right, Proxense has clearly mischaracterized the specification excerpts on which it relies:

| Proxense Assertions on Disclosure | Actual Disclosure from Specification |
|---|---|
| Proxense's solution was elegant. A low powered PDK receives a beacon signal from a fixture-based RDC that would put the PDK in contact with a server.  To maximize its battery life, the PDK would "sleep" by default, *i.e.*, maintain the transceiver of wireless RF MAC and PHY device 82 in Fig. 5 of the '533 Patent in a low-power state so that no transmission or reception occurs. Then, the transceiver will "wake up" on a set timed schedule to look for a signal on a particular channel from an RDC. | The PDK is in battery save mode and periodically wakes up looking for a network. As shown in FIG. 26, the PDK starts in a deep sleep state. The wakeup timer eventually expires, causing the PDK to enable and tune its receiver. The PDK then monitors the channel that it tuned to for a period of one 17 timeslots (one superframe plus one slot), or approximately 83 milliseconds. The 17 timeslot limit is based on a superframe of 16 timeslots, and the fact that the PDK, upon initial reception, could miss the beginning of a beacon. The additional slot provides the overlap necessary to guarantee reception of a beacon if one is present. |
| ***If a signal wasn't available, the PDK would*** increase its channel number and ***look again for the beacon signal***. | ***If no beacon is detected***, the channel number is incremented (modulo 16) and ***the PDK*** resets its wakeup timer and ***returns to deep sleep mode***. |
| ***After the PDK*** either ***found a compatible beacon signal*** or heard nothing, ***it would reset its timer and return to sleep***. The generally exemplary process is depicted in Fig. 26 of the '533 Patent.<br><br>Op. Br. at 4. | ***If a beacon is detected, the PDK checks for a network ID*** and if one is not found, it again increments the channel number, resets its wakeup timer, and returns to deep sleep mode. ***If the network ID is detected, the PDK attempts to establish a communications link with the RDC***. '533 Patent at 26:63-27:15. |

The "No Beacon Detected" and "Proxense network detected" flows in Fig. 26 (reproduced Op.
Br. p. 5) identically track the actual text of the specification in the right column above (and ***not***

Proxense's assertions in the left column). These mischaracterizations are material to the parties' disputes for the "time slot information" limitations. Indeed, this portion of the specification (and Fig. 26) describes the same sleep/wake cycle scenario recited in the Asserted Claims[6] and, accordingly, Target's constructions capture this intrinsic evidence in a manner comprehensible to a jury. By mischaracterizing the specification, Proxense is transparently attempting to prop up its argument which asks the Court to permit the jury to treat the claimed "time slot information" as simply any "information" about any "timeslot" that is used for any purpose. *See also* § III.A.

> **B.  Proxense Manifestly Mischaracterizes the Specification's Disclosure Relevant to the "Server" Limitations**

In its Opening Brief, Proxense also states that 6:30-47, 9:14-10:14, 10:21-38, and 15:15-21 of the specification support its assertion "the specification describes a sophisticated PDK in an environment that allows the PDK to communicate ***directl***y with the claimed server." Op. Br. at 11-12 (emphasis added). However, and as shown in more detail below, the specification does ***not***, at any of these pin cites or elsewhere, disclose a PDK communicating ***directly*** with a server, *i.e.*, without going through an intermediary RDC. *See* '533 Patent at 6:30-47, 9:14-10:14, 10:21-38, 15:15-21[7]; Ex. A (Declaration of Dr. Benjamin Goldberg with Regard to Certain Claim Phrases in U.S. Pat. No. 10,455,533 ("Goldberg Decl.")) at ¶¶51-67.

Appearing to recognize this fact, Proxense relies on its expert's (Mr. Humphrey's) statements that "cellular phones" were known to have "the capability to communicate wirelessly with servers" as purported support for the above assertion and similar assertions that the

---

[6] '533 Patent at claim 1 (41:48-60), claim 11 (42:28-35), Figure 26, 26:61-27:15.

[7] Although not clear from its brief (and as its expert does not point to these pincites), to the extent that Proxense argues that 30:29-51 or 37:16-57 disclose a PDK directly communicating with a server, without an intermediary RDC, these arguments also have ***no*** factual support. Op. Br. at 15-16; *see e.g.* '533 Patent at 30:16-51, 37:16-57, Fig. 36; Goldberg Decl., ¶¶51-55, 61-67.

specification discloses **direct** communications between PDKs and servers, Op. Br. at 11-12, 16; Decl. of Mr. Humphrey (Dkt. 26-1) at ¶¶22, 26. Then, Proxense attempts to read a cellular phone's additional communication capabilities into the specification's disclosure of a PDK by repeatedly asserting that the specification "explicitly discloses that the PDK could be a cell phone." Op. Br. at 16 (*citing* '533 Patent at 6:30-47); *see also id.* at 5 ("The user's PDK may be any wireless device that may be worn or carried by a user, including a cellular phone."); 11, ("[T]he specification describes a sophisticated PDK"), 12 ("PDK may be, e.g., a cell phone"). The specification does **not**, whether at 6:30-47 or at any other portion, disclose that a PDK **itself** could be a cellular phone. *See, e.g.*, '533 Patent at 6:28-47, 9:4-6, 9:24-32; Goldberg Decl. at ¶¶47-48. Rather, in relation to a cellular phone (and other "mobile computing device[s]"), the specification (including 6:30-47) clearly states that a PDK "may actually be **integrated _with_ or implemented _in_ _another device_, such as a** watch or mobile computing device (*e.g.*, **cellular phone**, personal digital assistant (PDA))." *Id.*

Regardless, the specification does **not** disclose PDKs communicating **directly** with a server *i.e.*, without an intermediary RDC, in whatever form it can take (including, *e.g.*, PDKs integrated into cellular phones ('533 Patent at 6:42-47)). *See* Goldberg Decl. at ¶¶51-67. For example, in the provisional application that Proxense incorporated by reference into the specification (Ex. B, U.S. Prov. Pat. App. No. 60/760,362 (the "'362 Provisional")), the inventor generally describes how the PDK and RDC components allegedly provide a novel architecture:

> This document will provide a functional description of the Proxense TruProx® specifications. It details the TruProx architecture and its components: the Personal Digital Key (PDK®) architecture, Reader Decoder Circuit (RDC) architecture, the communications protocol, and various system configurations … **The Proxense TruProx system and intellectual property together provide a method of securing transactions between a user carrying a Proxense PDK**®, or 'electronic key' **and a Proxense fixed part, the RDC, which are within a reasonable proximity of each other** … A Proxense system in the most basic form is comprised of a PDK® and

an RDC unit.  The PDK® … is a device that can be worn, placed in the pocket of a user, or attached to equipment, has a bidirectional wireless communications transceiver, and contains both public and secret electronic ID numbers as well as cryptographic keys.  The RDC is a device providing a fixed access point for a mobile PDK … to communicate with. The RDC is effectively a gatekeeper for a [PDK] that wants to access the system. ***The RDC may be incorporated into*** a casino floor, electronic game, doorway, pedestrian traffic monitoring point, or into a personal computer application, an ecommerce device such as ATM machines, or ***any other application where secure transactions must take place***.

'362 Provisional at pp. 11-12 (emphasis added); *see also* '533 Patent at 6:28-7:19.  The '533

Patent specification generally describes the interactions between PDKs (annotated red) and

RDCs (annotated dark green) in "Proxense's TruProx system", and how such PDK←→RDC

interactions conduct secure transactions, including those with a "central server" (annotated blue),

as follows and with reference to Figure 1 (annotated and reproduced to the right below):

When an individual carrying the PDK 14 comes into proximity of the RDC 12 by entering a coverage area of the RDC 12, a wireless communications session is initiated between the PDK 14 and the RDC 12. If the RDC 12 determines that the PDK 14 is authorized to communicate, information between the PDK 14 and the RDC 12 may be securely exchanged. Information securely obtained from the user's PDK 14 may then be used locally or sent through a back-end communications channel to a central server (not shown). When the transaction completes or when the PDK 14 leaves the coverage area of the RDC 12, wireless communication between the RDC 12 and the PDK 14 ceases. Thereafter, the RDC 12 may remain idle (i.e., be in a "tracking" mode) until a PDK again enters the cell 10.



Figure 1

'533 Patent at 7:23-37; '362 Provisional at p. 12.

The '533 Patent specification describes PDKs (annotated red, below right) and RDCs

(annotated dark green, below left) as each including particular capabilities in order for RDCs to

authorize PDKs and then to establish secure wireless links with such PDKs, and that Proxense

RDCs would have additional capability including a "service provider interface" to communicate

via a "backend communications channel" with servers (annotated blue):



Figure 9

Figure 5

'533 Patent at 9:1-12:44[8], 35:43-36:10[9]; '362 Provisional at pp. 16-25, 70; Goldberg Decl. ¶53.

In sharp contrast to the disclosure for RDCs, the specification does ***not*** disclose PDKs as having a "service provider interface", ***nor*** does the specification disclose PDKs as having ***any*** capability to interface with (or include) a "service provider controller" (annotated gray in Fig. 9 above), including its "computing controller" and "system stack", ***nor*** does the specification disclose PDKs as having ***any*** capability to communicate over a "wired connection" or "via wireline", ***nor*** does the specification disclose the PDK as having ***any*** capability to communicate ***directly***, *i.e.*, without an intermediary RDC, with a "server", "central server" or "service provider back-end system." *See* Goldberg Decl. at ¶55 (internal citations omitted).

---

[8] *See* '533 Patent at 11:55-58, 35:56-36:10, Figures 5-9 (describing how the RDC registers the PDK and how the RDC "installs and configures" onto the PDK "service provider information located on the central server"); *see also* '362 Provisional at pp. 16-25, 66 (under heading "5.3.4.2 Registration RDC configuration"), Figures 5-10; Goldberg Decl., ¶¶53-55, 64.

[9] *See also* '533 Patent at Figs. 38, 41, 25:20-65, 38:48-39:6, 40:6-24; '362 Provisional at pp. 51, 16-25, 74-76, 79-80 (disclosing "electronic games" with "integrated RDC[s]" that, like standalone RDCs, similarly include a "service provider interface" to communicate via a "backend communications channel" with servers); Goldberg Decl. ¶¶54, 66.

Moreover, as Proxense specifically asserts that 10:21-38 of the specification discloses that a "PDK may be granted **direct** access to a server by a gatekeeper RDC" (Op. Br. at 11-12), Target reproduces the entirety of this specification excerpt below, as well as the immediately succeeding text at 10:39-47 (which Proxense omits from its citation):

> Next, turning to a more detailed description of an RDC 100 according to one or more embodiments, reference is made below to FIGS. 8 and 9. In general, an RDC 100, as described above, may be fixed and used to allow a PDK access into a particular system (e.g., gaming/casino system, financial institution, retail system). The RDC 100 may have different configurations to support different types of secure transactions. Some examples of applications and uses of RDCs include, but are not limited to, casino slot machines and gaming consoles, secure entryway control, user/equipment location tracking, personal computers and components thereof (e.g., disk drives), financial institution interactions, and retail purchasing. In the case of a personal computer, or any computer system for that matter, a reader device, such as an RDC, may be used to control access to certain data stored in the computer system. Thus, in such embodiments, an RDC 100 may be thought of as providing a form of digital content management. *In certain cases, the RDC* 100 *effectively acts as a gatekeeper* allowing authorized individuals access to specific information or transactions. *In other cases, because an RDC* 100 *may use proximity detection for determining if a PDK is within a particular geographical area, the RDC* 100 *may also be used for tracking one or more PDKs* within a given area or network. *In still other cases, an RDC* 100 *may be used for both location tracking and secure transaction purposes*.

'533 Patent at 10:21-47 (emphasis added). As shown above, Proxense clearly mischaracterizes the specification's disclosure at 10:21-38. Goldberg Decl. at ¶56.

And, as Proxense specifically asserts that 15:15-21 of the specification discloses that a "PDK may be granted access to the back-end server", and relies on this disclosure as support for its assertion that "the specification describes a **sophisticated** PDK in an environment that allows the PDK to communicate **directly** with the claimed server" (Op. Br. at 11-12) (emphasis added), Target reproduces the entirety of this specification excerpt below, as well as the immediately preceding text at 15:7-8, the immediately succeeding text at 15:22-35 (which Proxense omits from its citation), the corresponding Figure 16 (below right), and the text at 11:62-67 (describing the "service provider controller" (annotated gray) of Figure 9 (reproduced above)):

9

An external service provider controller 122 may be attached to the service provider interface 120 [of the RDC 140] with a system stack 124 residing in the external service provider controller 122. The system stack 124 may allow a third party to easily interface with the RDC 100, possibly requiring function calls to the system stack 124.

'533 Patent at 11:62-67; *see also id.* at 12:8-10; '362 Provisional at pp. 23-25.

An example handshake of the PDK 142 with the RDC 140 is shown in FIG. 16 … The RDC 140 then detects the PDK location response and performs a link request to the PDK 142. The PDK 142 then accepts the request by replying with a link grant, and the two devices 140, 142 are now in data exchange mode. In data exchange mode, the two devices 140, 142 may transfer specific security information that result in **the RDC 140 enabling access to the system through the system stack, computing controller, and/or back-end central server**. **Periodically, data may be exchanged between the RDC 140 and the PDK 142** to ensure that the PDK 142 is still within close proximity of the RDC 140. **As long as data exchange continues on a periodic basis**, the application may remain enabled and the user can continue to access the application. After some amount of time, **the user walks away from the RDC 140 causing the data exchange to cease**, in which case, the system stack indicates to the computing controller that the PDK 142 is out of range. The computing controller then disables the application to prevent unauthorized access. Regardless of data exchange, the RDC 140 may continue to transmit periodic beacons to guarantee that other PDKs may gain access to the application.



Figure 16

'533 Patent at 15:7-8, 14-35; *see also* '362 Provisional at pp. 31-32.  Again, Proxense manifestly

mischaracterizes the specification's disclosure at 15:14-21 because, as shown above and

consistent with the other described embodiments[10], the described "link", and "data exchange" over such link, is *only* disclosed as being between an RDC (annotated dark green) and PDK (annotated red) and, as soon as the PDK moves out of range of the RDC, the "system stack" and "computing controller"—in the "service provider controller" (annotated gray) between the RDC and back-end "server" (annotated blue)—"disable[s]" any "application" being accessed by a user. *Id*.; *see also* Figures 5, 9 (reproduced above); Goldberg Decl. at ¶¶52-55, 57-60, 64-66.

Thus, the Court should reject Proxense's transparent attempt to rewrite the specification, that it filed more than fifteen (15) years ago, to argue that this specification disclosed embodiments that cover, when it clearly does not, the meanings of the "server" limitations, in the claims Proxense filed in 2019, that Proxense requires in order to argue infringement. *See* § III.B.

## III.    ARGUMENT

### A.    The "Time Slot Information" Limitations Require Construction and Such Construction Cannot be Divorced from the Claim Language and Relevant Disclosure in the Specification

While Proxense accurately reproduced the Asserted Claims (Op. Br. at 7-8), it made several errors in reproducing the parties' previously proposed constructions (Op. Br. at 8, 12). Target corrects that information in the table below:

| Disputed Claim Phrases | Proxense's Position | Target's Position |
|---|---|---|
| [1.d] "[a timer … used to indicate when to switch from sleep mode to active mode] based on time slot information" | No construction is necessary; plain and ordinary meaning<br><br>Alternatively, "time slot information" means "a period of time that information is communicated between two devices information" or | "[a timer … used to indicate when to switch from sleep mode to active mode] based on the predetermined period of time between the start of two successive beacons from the first wireless transceiver" |

---

[10] *See also* similar disclosure in '533 Patent at 22:65-23:5, 28:39-50, 39:15-40:5, 40:33-41:20 (Figs. 24, 28, 39, 42); '362 Provisional at pp. 46-47 (Figure 25), 56-58 (Figure 29), 76-77 (Figure 40), 80-81 (Figure 43); Goldberg Decl. at ¶¶52-55, 57-60, 65-66.

| | "information about a period of time that information is communicated between two devices"[11] | |
|---|---|---|
| [11.a] "[the timer indicating when to switch from sleep mode to active mode] based on time slot information" | No construction is necessary; plain and ordinary meaning<br><br>Alternatively, "time slot information" means "a period of time that information is communicated between two devices information" or "information about a period of time that information is communicated between two devices" | "[the timer indicating when to switch from sleep mode to active mode] based on the predetermined period of time between the start of two successive beacons from the source of such beacons"[12] |

Proxense argues that, as claimed and described in the specification, there is "no reason" to "tie[] the duration of a time slot to beacons sen[t] to a PDK from an RDC." Op. Br. at 9. In doing so, Proxense ignores limitations [1.e] and [11.b] in claims 1 and 11, which require that the claimed purpose of the "active mode" of the "[second][13] wireless transceiver" (PDK) is to "monitor[] a first channel for a beacon during the active mode." '533 Patent at claim 1 (41:58-60), claim 11 (42:33-34). As such, the particular claimed "time slot information" is used in a wakeup/sleep scenario where the purpose of switching from the "sleep mode" to the "active mode" is to attempt to hear a "beacon" from a "source of the beacon" (*e.g.*, "first wireless device.") *Id*. Furthermore, in addition to ignoring these claim limitations, Proxense's arguments rely on its blatant mischaracterization of the disclosure in the specification for this exact scenario. *See* § II.A above (comparing Op. Br. at 4 with '533 Patent at 26:63-27:15, Fig. 26).

---

[11] Despite numerous requests by Target, and Proxense having Target's constructions since April 12, 2021, Proxense refused to disclose what it contended was the "plain and ordinary meaning" of these terms in the disputed phrases until its Opening Brief on May 24, 2021.

[12] Proxense erroneously transposed Target's construction for [11.a] as "the predetermined period of time between the start of two successive beacons *from the first wireless transceiver*."

[13] *See* fn.3 (noting that, in contrast to claim 1, claim 11 only recites one "wireless tranceiver".)

Indeed, and contrary to Proxense's assertions (Op. Br. at 4), the specification discloses that, for the identical wakeup/sleep scenario as the claims—where the purpose of the PDK's "active mode" is to attempt to hear a beacon from a RDC—"if no beacon is detected…the PDK resets its wakeup timer and returns to deep sleep mode" and "if a beacon is detected … [and] the network ID is detected, the PDK attempts to establish a communication link with the RDC." *See* § II.A above; '533 Patent at 26:61-27:15, Fig. 26. In sharp contrast to Proxense's arguments and constructions, Target's constructions flow directly from this surrounding claim language and the disclosure in the specification corresponding to the particular wakeup/sleep scenario in the claims, including its description of setting a timer duration for the predetermined period of time between the start of two successive beacons from an RDC, and in order for the PDK to "guarantee reception of a beacon if one is present" in such scenario. '533 Patent at 26-65-27:7 (describing setting the timer at 17 timeslots for the preferred wireless protocol). Likewise, Target's constructions plainly do not, as Proxense alleges (Op. Br. at 9-12), require "***bi-directional*** communication between the first and second wireless devices." (emphasis added).

Moreover, Proxense obfuscates the parties' dispute and asks the Court not to construe these terms in an attempt to expand the claim scope into something it clearly did not invent. Proxense's underlying argument regarding these disputed phrases—that, absent lexicography or a clear and unmistakable disavowal, the Court is compelled to give the term "time slot information" its full breadth in a vacuum, disconnected from the particular use of that term in the context of the claims, and disconnected from the specification's actual disclosure for the particular claimed scenario—is simply wrong. Op. Br. at 8-12. Indeed, this argument flies in the face of long-standing Federal Circuit precedent requiring that claims must *always* be read in light of the specification and its teachings at the time of the invention, and that constructions *cannot*

be divorced from the specification and the record evidence.  *See, e.g., Microsoft Corp. v. Proxyconn, Inc.,* 789 F.3d 1292, 1298 (Fed. Cir. 2015) ("Claims should *always* be read in light of the specification and teachings in the underlying patent" and "[e]ven under the broadest reasonable interpretation" (a broader standard than the *Phillips* standard required by the Court here), the construction "*cannot* be divorced from the specification and the record evidence.") (emphasis added), *overruled on other grounds* by *Aqua Prods., Inc. v. Matal*, 872 F.3d 1290 (Fed. Cir. 2017) (en banc); *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed. Cir. 2005).  These principles are especially critical here where, in remarkable fashion, Proxense clearly mischaracterizes the written description support for the particular purpose and usage of "time slot information" in the disputed claim phrases.  *See* § II.A above (comparing Proxense's assertions in Op. Br. at 4 with the actual text of '533 Patent at 26:63-27:15 and Fig. 26).

Proxense's alternative constructions (reproduced in the table on pages 11-12 above) are premised on a similar argument with the only distinction being its proposal that the Court treat the specification's discussion of "timeslot" at 13:17-22 as the inventor acting as a lexicographer to define this word for all purposes and for all claims.  Op. Br. at 11-12.  There is no dispute between the parties that 13:17-22 of the specification states:

> As described above, a system in accordance with one or more embodiments may rely, or at least partly be based, on an IEEE 802.15.4 protocol. In relation to a protocol usable in one or more embodiments, a 'timeslot' is defined as a period of time that information is communicated between two devices."

However, Proxense's constructions simply apply this specification excerpt in a vacuum by replacing any use of the word "time slot" in the claims with "a period of time that information is communicated between two devices", regardless of ***how*** this word is used in the context of a given claim, and regardless of the specification's disclosure for the particular scenario recited in a given claim.  For the same reasons, Proxense is simply wrong.  Proxense's constructions,

which do not take into account the particular use of "time slot information" in the particular claimed wakeup/sleep scenario, also confirm that its statements identifying that the remainder of the disputed claim phrase language gives guidance as to the scope of the particular "time slot information" in the claims (Op. Br. at 10) pay mere lip service to this claim construction canon. Given the parties' dispute, this phrase should be construed now to avoid jury confusion later on. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).

### B. Proxense's Prosecution-Induced Ambiguities in the "Server" Limitations Render the Claims Indefinite

Proxense's arguments regarding the "server" limitations (Op. Br. at 12-16), and its clear and material mischaracterizations of the relevant disclosure in the specification (*see* § II.B above) confirm that Proxense intentionally introduced ambiguity into these phrases to attempt to capture 2019 technology that operated very differently than the invention Proxense described more than a decade earlier. Indeed, the ambiguity in the Asserted Claims stems from the disparity between, on the one hand, the possible meanings that ***Proxense requires*** to argue infringement and, on the other hand, the lack of any link whatsoever between ***Proxense's*** proposed interpretation and the actual disclosure in the specification. *See* § II.B above.

#### 1. Canons of the Definiteness Requirement under § 112, ¶2

The intent of § 112, ¶2, and the "definiteness" requirement, is to preserve and protect the public notice function served by claims. In the seminal *Nautilus* decision, the Supreme Court set forth the relationship between the public notice function and the "definiteness" requirement:

> [A] patent must be precise enough to afford clear notice of what is claimed, thereby "appris[ing] the public of what is still open to them." … Otherwise there would be "[a] zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims." … And absent a meaningful definiteness check, we are told, patent applicants face powerful incentives to inject ambiguity into their claims … Eliminating that temptation is in order, and "the patent drafter is in the best position to resolve the ambiguity in … patent claims." … Cognizant of the competing concerns, we read §112, ¶2 to require that

a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty … It cannot be sufficient that a court can ascribe *some* meaning to a patent's claims; the definiteness inquiry trains on the understanding of a skilled artisan at the time of the patent application, not that of a court viewing matters *post hoc*. To tolerate imprecision just short of that rendering a claim "insolubly ambiguous" would diminish the definiteness requirement's public-notice function and foster the innovation-discouraging "zone of uncertainty," … .

*Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 909-911 (2014) (emphasis in original) (internal citations omitted) (the Supreme Court also expressly overruling the Federal Circuit's prior "insolubly ambiguous" standard and expressly abrogating several district court decisions wrongly decided under this prior standard including *Every Penny Counts, Inc. v. Wells Fargo Bank, N. A.*, 4 F. Supp. 3d 1286, 1291-1292 (M.D. Fla. 2014)).

Relevant to the issues here, under the *Nautilus* definiteness test, if the "claim language 'might mean several different things and 'no informed and confident choice is available among the contending definitions'", the claims fail to inform a POSITA about the scope of the invention with reasonable certainty. *Interval Licensing LLC v. AOL Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014). Thus, under well-established precedent, Proxense's litigation-induced ambiguities render its claims invalid as indefinite if: (1) the disputed claim phrases might mean several different things to a POSITA, and (2) no informed and confident choice is available among the contending definitions. *Interval*, 766 F.3d at 1371; *see also, e.g., Parthenon Unified Memory Architecture LLC v. Apple Inc.*, No. 2:15-cv-00621-JRG-RSP, 2016 U.S. Dist. LEXIS 78935, *36-40 (E.D. Tex. June 16, 2016); *Advanced Aero. Techs., Inc. v. U.S.*, 124 Fed. Cl. 282, 292-293, 299-300 (2015); *Adaptix, Inc. v. Apple, Inc.*, No. 5:13-cv-01776-PSG, 2015 U.S. Dist. LEXIS 8806, *13-14 (N.D. Cal. Jan. 23, 2015); *cf. Every Penny*, 4 F. Supp. 3d. at 1290-1292.

2.    The "Server" Limitations Would Have Multiple Meanings to a POSITA Reading the Claims in View of the Specification

Claims 1, 7 and 17 recite three different components, in relevant part: (1) a "first wireless

device" that has a "known physical location" and that is configured to transmit a "beacon", (2) a "second wireless device", including a "wireless transceiver", that, when its wireless transceiver is in "active mode", is configured to monitor a "channel" for a beacon transmitted by a "source of the beacon", and (3) a "server" that is configured to receive "data"/"gather information" "from the second wireless device." '533 Patent at claims 1 (41:41-65), 7 (42:16-17), 17 (43:1-4); Goldberg Decl. ¶¶ 22, 26-28. In contrast, independent claim 11 does *not* recite (1) a "second wireless device", *nor* (2) a source of the "data" sent to the "server" (*e.g.*, device performing the "sending" step, device that originates the "data" and forwards it to the device performing the "sending" step, etc.). '533 Patent at claim 11 (42:27-45); Goldberg Decl. ¶¶ 22, 26-28. Moreover, *none* of the claims expressly identify *what* (*e.g.*, which device (claimed or unclaimed)) is "in proximity to the first wireless device" to trigger the server's receipt of "data from the second wireless device" (claim 1) or the sending of "data" to the server (claim 11). *Id.*

Setting aside for a moment the issue of whether the specification discloses direct communications between PDKs and servers (which, as set forth in § II.B above, it does *not*), given the language of the claims and the clear, undisputed description in the specification that RDCs forward communications from PDKs to servers (and to PDKs from servers), a POSITA would understand that at least the following are possible meanings of the "server" limitations in independent claims 1 and 11 (and with similar meanings applying to dependent claims 7 and 17):

*1. An RDC forwards data from a PDK to the server when the PDK is in proximity to the RDC.*

- <u>Claim 1</u>: "a server configured to receive data <u>indirectly</u> from the second wireless device<u>, and directly from the first wireless device,</u> when <u>the second wireless device is</u> in proximity to the first wireless device"

- <u>Claim 11</u>: "<u>the first wireless device </u>sending data<u>, received by the first wireless device from the wireless transceiver, directly </u>to a server, when <u>the wireless transceiver is in</u> proximity to the first wireless device"

17

2. *A PDK sends data/information about itself directly to the server when the PDK is in proximity to an RDC.*

- Claim 1: "a server configured to receive data <u>directly</u> from the second wireless device when <u>the second wireless device is</u> in proximity to the first wireless device"
- Claim 11: "<u>the wireless transceiver</u> sending data <u>directly</u> to a server, when <u>the wireless transceiver is</u> in proximity to the first wireless device"

3. *A PDK forwards data from an RDC to a server when the PDK is in proximity to the RDC.*

- Claim 1: "a server configured to receive data <u>directly</u> from the second wireless device<u>, and indirectly from the first wireless device,</u> when <u>the second wireless device is</u> in proximity to the first wireless device"
- Claim 11: "<u>the wireless transceiver</u> sending data<u>, received from the first wireless device,</u> to a server, when <u>the wireless transceiver is</u> in proximity to the first wireless device"

4. *A PDK forwards data, received by the PDK from an unclaimed component (e.g., application, asset, service – see claims 5, 17), directly to a server (i.e., not via an RDC) when the PDK is in proximity to the RDC.*

- Claim 1: "a server configured to receive data <u>directly</u> from the second wireless device<u>, and indirectly from [an unclaimed component],</u> when <u>the second wireless device is</u> in proximity to the first wireless device"
- Claim 11: "<u>the wireless transceiver</u> sending data<u>, received from [an unclaimed component],</u> to a server, when <u>the wireless transceiver is</u> in proximity to the first wireless device"

5. *An RDC forwards data/information (e.g., "PDK ID & SQ"), that the RDC receives from a PDK, to an unclaimed component (e.g., electronic game) and, subsequently, that unclaimed component forwards that received data/information to a server.*

- Claim 1: "a server configured to receive data <u>indirectly</u> from the second wireless device <u>and the first wireless device, and directly from [an unclaimed component],</u> when <u>the second wireless device is</u> in proximity to the first wireless device<u>, wherein said data was previously sent to the first wireless device by the second wireless device and then forwarded from the first wireless device to [the unclaimed component]</u>"
- Claim 11: "<u>[an unclaimed component]</u> sending data<u>, received indirectly from the wireless transceiver via the first wireless device,</u> to a server, when <u>the wireless transceiver is</u> in proximity to the first wireless device"

Goldberg Decl. at ¶¶26-40 (internal citations omitted); § II.B above; Op. Br. 10-11, 14. Each of these five meanings are plausible to a POSITA based on the claim language alone; however, as detailed in § II.B above, meanings (1) and (5) are the ***only*** meanings that are consistent with the actual disclosure of the specification. § II.B; Goldberg Decl. at ¶¶26-34, 39-40, 51-67.

Moreover, given the additional ambiguity in the limitation "sending data to a server, when in proximity to the first wireless device" in claim 11, a POSITA would understand that, in addition to possible meanings (1) to (5) above, several more meanings are possible in view of the plain language of claim 11. Goldberg Decl. at ¶¶41-43. While Proxense argues that "the claims do not reasonably present multiple possible meanings", it effectively admits that the "server" limitations of claims 1, 7, 11 and 17 could have multiple meanings when it acknowledges "[t]he claim language is silent on the specific path by which the server receives data" and the "'server' limitations do not require the second wireless device to communicate through the first wireless device … [this] may be permissible, but it is not necessary." Op. Br. at 10-11, 14.

3. A POSITA Would Have No Informed or Confident Choice Among the Contending Meanings

Despite its admissions that the claims can be interpreted multiple ways, Proxense argues (*see* § II.B) that its own prosecution-induced ambiguities have ***no*** legal consequence. That is simply not the case and Proxense cannot argue away the indefiniteness that it created by relying on its material mischaracterizations of the specification (*see* § II.B). Indeed, a POSITA reading the specification would be informed that both meanings (1) or (5) above could be proper interpretations of the claim language because the specification-described embodiments all involve PDKs only communicating with servers via RDCs. § II.B above; Goldberg Decl. at ¶¶44-69. However, as detailed in § III.B.2 above and, as a direct consequence of Proxense's prosecution strategy and claim drafting aimed at capturing 2019 technology that is inconsistent

with the specification it filed more than a decade earlier, a POSITA would understand that the plain language of the claims is broad enough to also read onto any one of meanings (2) to (4) above. Indeed, Proxense argues that the claims **must** be interpreted to be broad enough to encompass at least one of meanings (2)-(4) above (Op. Br. at 10-12, 15-16), and it has to make this argument because its infringement theory depends on it. Thus, particularly given the clear disparity between, on the one hand, Proxense's arguments premised on its inaccurate interpretation of the specification (*e.g.*, meanings (2) – (4)), and the actual disclosure in the specification (*e.g.*, meanings (1) or (5)), a POSITA would have no informed or confident choice among these multiple, possible meanings. *See* § II.B above; Goldberg Decl. at ¶¶44-69.

Contrary to Proxense's assertions, its purposeful injection of ambiguity into these limitations, and the resulting "innovation-discouraging zone of uncertainty", has legal consequences because it constitutes precisely the attack on the public notice function of claims that the Supreme Court sought to resolve in its *Nautilus* decision. 572 U.S. at 909-911. Therefore, under Supreme Court and Federal Circuit precedent, the Court should find that Proxense's prosecution-induced ambiguities render its claims invalid as indefinite. *Id.*; *Interval Licensing*, 766 F.3d at 1370-1371; *see also Parthenon*, 2016 U.S. Dist. LEXIS 78935 at *33-40; *Advanced Aero.*, 124 Fed. Cl. at 299-300; *Adaptix*, 2015 U.S. Dist. LEXIS 8806 at *20-24; *Every Penny*, 4 F. Supp. 3d. at 1288-1291.

Date: June 14, 2021

/s/ Gilbert A. Greene
Gilbert A. Greene
**DUANE MORRIS LLP**
Las Cimas IV
900 S. Capital of Texas Highway, Suite 300
Austin, TX 78746
Tel.: 512-277-2246
Fax: 512-597-0703
Email: BGreene@duanemorris.com

Matthew S. Yungwirth (admitted *pro hac vice*)
**DUANE MORRIS LLP**
1075 Peachtree Street NE, Suite 1700
Atlanta, GA 30309-3929
Telephone: 404-253-6900
Email: msyungwirth@duanemorris.com

Christopher J. Tyson (admitted *pro hac vice*)
**DUANE MORRIS LLP**
505 9th Street N.W., Suite 1000
Washington, DC 20004-2166
Tel: 202.776.7800
Email: cjtyson@duanemorris.com

*Counsel for Target Corporation*

## CERTIFICATE OF SERVICE

I certify that on June 14, 2021, I electronically filed the foregoing with the Clerk of Court

using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ *Gilbert A. Greene*